**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MELODY GISSENTANNER, as Personal Representative of the Estate of Brian Gillis,

Plaintiff,

v.

OFFICER CALEB BUMGARNER, and CITY OF JACKSONVILLE, FLORIDA,

Defendants.
_______________________________________/

Case No. 3:26-cv-3192

Jury Trial Demanded

# COMPLAINT

Plaintiff, Melody Gissentanner, as the Personal Representative of the Estate of Brian Gillis, by and through her attorneys Hale Law, LLC and Sherris Legal, P.A., complains of Defendants Officer Caleb Bumgarner and the City of Jacksonville, Florida as follows:

## Introduction

1. From 2015 to 2024, 10,429 people were shot and killed by police in the U.S.[1] Black Americans account for roughly 14 percent of the U.S. population, and yet they are killed by police at more than twice the rate of White Americans. *Id.* Approximately 20% of adults in the U.S. have mental health issues.[2] From 2015 to 2024, approximately 20% of fatal police shooting victims in the U.S. were experiencing a mental health crisis at the time of their death.[3] In 2025 alone, Jacksonville Sherriff's Officers shot 17 individuals, 11 of them fatally.[4]

[1] https://www.washingtonpost.com/graphics/investigations/police-shootings-database/. This database contains records of every person shot by an on-duty police officer between Jan. 1, 2015, and Dec. 31, 2024, and contains many other statistics broken down by categories like age, race, and gender.
[2] https://www.nami.org/learn-more/mental-health-by-the-numbers
[3] https://www.washingtonpost.com/graphics/investigations/police-shootings-database/
[4] https://opendata.jaxsheriff.org/OIS. For perspective, in Chicago, a city with nearly three times the population of Jacksonville, police fatally shot only 9 individuals in 2025. *Source:* WTTW News' analysis of data released by the Civilian Office of Police Accountability ("COPA").

2. This case arises from the unjustified deadly shooting of thirty-year-old Brian Gillis by Officer Caleb Bumgarner that took place on August 13, 2025. As alleged below, JSO Officer Bumgarner, in violation of the U.S. Constitution and JSO's own policies and training, unlawfully shot Brian Gillis, a man he knew was having a mental health crisis, multiple times in the back, despite the fact that Mr. Gillis had not done anything to place Officer Bumgarner, or anyone else, in imminent danger of death or great bodily harm. This fatal shooting was staggeringly egregious and completely avoidable.

**Parties**

3. Plaintiff Melody Gissentanner is the mother of Brian Gillis (deceased) and a resident of Florida. Plaintiff is the court appointed personal representative of the Estate of Brian Gillis.

4. Defendant Officer Caleb Bumgarner was, during the relevant time, employed by the City of Jacksonville as a sworn law enforcement officer and acted within the scope of his employment and under color of law.

5. Defendant City of Jacksonville, Florida is a municipal corporation organized and doing business under the laws of the State of Florida. During the relevant time, the City of Jacksonville employed Officer Caleb Bumgarner as a police officer.

**Jurisdiction and Venue**

6. This action arises under the Constitution of the United States, specifically the Fourth Amendment, and under the laws of the United States, specifically the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Florida.

7. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, Sections 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

8. Venue is proper in the Middle District of Florida, Jacksonville Division, under Title 28 of the United States Code, Section 1391(b)(2), as the events giving rise to this litigation occurred within this district, specifically in Jacksonville in Duval County, Florida.

**Count I**
**42 U.S.C. § 1983**
**Fourth Amendment Violation - Excessive Force against Defendant Officer Bumgarner**

9. On August 13, 2025 at 7:09 a.m., Plaintiff Melody Gissentanner called JSO stating that her son Brian Gillis is mentally ill and that he damaged some of her neighbor's property earlier that night. She requested that officers come to her home so that Brian could be taken into custody for a mental health evaluation pursuant to the Baker Act.[5]

10. At 7:43 a.m., an officer assigned to JSO's Behavior Crisis Response Unit and a licensed mental health clinician responded to Melody's home.

11. Melody told the responding officer and the clinician that her son had a documented mental health history with JSO which included two admissions (in 2018 and 2020) for involuntary hospitalization pursuant to the Baker Act. Melody also explained that her son was accidently shot in the face, about eight years ago, and that he may have suffered a traumatic brain injury as result. Melody again asked that her son be taken into custody for a mental health evaluation.

[5] Chapter 394 of the Florida Statutes, known as "The Baker Act," allows police officers to voluntarily or involuntarily take custody of a mentally ill individual for the purpose of administering a mental health examination. Enacted in 1971, the law is designed to protect the rights and liberty interests of individuals with mental illness.

12. Melody's neighbor also spoke to the officer and clinician. Melody's neighbor told the officer that she would fix the damage to her property, and when asked what she would like to see happen to Brian, she specifically responded, "I just want him to get some help."

13. While the officer and clinician were engaged in discussion, Brian left his home, on foot, in an unknown direction. Several officers patrolled the neighborhood, for over an hour, searching for Brian.

14. At 9:18 a.m., Defendant Officer Caleb Bumgarner observed Brian walking on a sidewalk, several blocks from his home. Officer Bumgarner was in his patrol vehicle along with his K-9 partner.

15. Instead of waiting for backup or calmly approaching Brian, a person he knew was having a mental health crisis, Officer Bumgarner immediately threatened Brian by ordering him to "come here or you're going to get dog bit."

16. Frightened by this threat, Brian began to run away from Officer Bumgarner. Officer Bumgarner quickly caught up to Brian in his patrol vehicle, and then exited his vehicle.

17. Again, contrary to his training, Officer Bumgarner immediately withdrew his taser, pointed it at Brian, and ordered him to get on the ground. In response, Brian briefly stopped running, turned around with a small knife in his hand,[6] said "back up, back up" and then continued running away from the officer.

18. As Brian was running away from Officer Bumgarner, and with no other officers or civilians in sight, Officer Bumgarner put away his taser, drew his firearm, and then shot Brian multiple times in the back.

[6] In a further effort to exaggerate the danger to Officer Bumgarner, JSO described the knife as a "large, unsheathed knife." When in reality, the knife was a common paring knife, with about a 3-inch blade.

19. At the time Officer Bumgarner discharged his firearm, Brian had done nothing to put a reasonable police officer in fear of imminent death or great bodily harm.

20. Based on the totality of the circumstances, the use of deadly force by Officer Bumgarner against Brian was not reasonable.

21. Officer Bumgarner' use of deadly force against Brian violated Brian's rights under the Fourth Amendment.

22. As a result of the violation of his Fourth Amendment rights, Brian suffered severe injury, including death.

23. As the personal representative of his estate, Plaintiff brings this action for redress against Officer Bumgarner for violating Brian's civil rights.

**Request for Relief**

WHEREFORE, Plaintiff Melody Gissentanner, as personal representative of the Estate of Brian Gillis, prays for judgment against Defendant Officer Caleb Bumgarner and requests an award of compensatory damages, punitive damages, attorneys' fees, costs, and any other relief that is just and appropriate.

**Count II**
**Florida Law**
**Wrongful Death against Defendant City of Jacksonville, Florida**

24. On August 13, 2025 at 7:09 a.m., Melody called JSO stating that her son Brian is mentally ill and that he damaged some of her neighbor's property earlier that night. She requested that officers come to her home so that Brian could be taken into custody for a mental health evaluation pursuant to the Baker Act.[7]

[7] Chapter 394 of the Florida Statutes, known as "The Baker Act," allows police officers to voluntarily or involuntarily take custody of a mentally ill individual for the purpose of administering a mental health examination. Enacted in 1971, the law is designed to protect the rights and liberty interests of citizens with mental illnesses.

25. At 7:43 a.m., an officer assigned to JSO's Behavior Crisis Response Unit and a licensed mental health clinician responded to Melody's home.

26. Melody told the responding officer and the clinician that her son had a documented mental health history with JSO which included two admissions (in 2018 and 2020) for involuntary hospitalization pursuant to the Baker Act. Melody also explained that her son was accidently shot in the face, about eight years ago, and that he may have suffered a traumatic brain injury as result. Melody again asked that her son be taken into custody for a mental health evaluation.

27. Melody's neighbor also spoke to the officer and clinician. Melody's neighbor told the officer that she would fix the damage to her property, and when asked what she would like to see happen to Brian, she specifically responded, "I just want him to get some help."

28. While the officer and clinician were engaged in discussion, Brian left his home, on foot, in an unknown direction. Several officers patrolled the neighborhood, for over an hour, searching for Brian.

29. At 9:18 a.m., Defendant Officer Caleb Bumgarner observed Brian walking on a sidewalk, several blocks from his home. Officer Bumgarner was in his patrol vehicle along with his K-9 partner.

30. Instead of waiting for backup or calmly approaching Brian, a person he knew was having a mental health crisis, Officer Bumgarner immediately threatened Brian by ordering him to "come here or you're going to get dog bit."

31. Frightened by this threat, Brian began to run away from Officer Bumgarner. Officer Bumgarner quickly caught up to Brian in his patrol vehicle, and then exited his vehicle.

32. Again, contrary to his training, Officer Bumgarner immediately withdrew his taser, pointed it at Brian, and ordered him to get on the ground. In response, Brian briefly stopped

running, turned around with a small knife in his hand,[8] said "back up, back up" and then continued running away from the officer.

33. As Brian was running away from Officer Bumgarner, and with no other officers or civilians in sight, Officer Bumgarner put away his taser, drew his firearm, and then shot Brian multiple times in the back.

34. At the time Officer Bumgarner discharged his firearm, Brian had done nothing to put a reasonable police officer in fear of imminent death or great bodily harm.

35. Based on the totality of the circumstances, the use of deadly force by Officer Bumgarner against Brian was not reasonable.

36. Officer Bumgarner' use of deadly force against Brian violated Brian's rights under the Fourth Amendment.

37. As a result of the violation of his Fourth Amendment rights, Brian suffered severe injury, including death.

38. As the personal representative of his estate, Plaintiff brings this action for redress against Officer Bumgarner for violating Brian's civil rights.

39. At the time Officer Bumgarner discharged his firearm, Brian had done nothing to put a reasonable police officer in fear of imminent death or great bodily harm.

40. Based on the totality of the circumstances, the use of deadly force by Officer Bumgarner against Brian was not reasonable.

41. At all relevant times, there existed the Florida Wrongful Death Act, statutorily set forth at Fla. Stat. §§768.16 - 768.26.

---

[8] In a further effort to exaggerate the danger to Officer Bumgarner, JSO described the knife as a "large, unsheathed knife." When in reality, the knife was a common paring knife, with about a 3-inch blade.

42. At all relevant times, Defendant City of Jacksonville, Florida was under a duty to refrain from intentional wrongful acts against citizens.

43. On August 13, 2025, Defendant City of Jacksonville, Florida violated that duty by acting with intentional disregard for the safety of Brian. Specifically, Defendant City of Jacksonville, Florida, through its agents, engaged in intentional wrongful conduct, thereby committing a battery against Brian, in one or more of the following ways:

A. Intentionally shot Brian without lawful justification;

B. Discharged a weapon in such as manner as to shoot Brian without lawful justification;

C. Used excessive and unreasonable force;

D. Failed to exercise the proper level of force that was warranted under the circumstances;

E. Failed to properly respond to the situation, failed to properly de-escalate the situation, and failed to properly defuse the situation, without resorting to deadly force;

F. Shot Brian when there was no reasonable belief that deadly force was necessary to prevent death or great bodily harm to anyone;

G. Acted inconsistently with and/or violated applicable law enforcement standards, including but not limited to City of Jacksonville, Florida standards as they relate to the use of force and/or deadly force;

H. Acted inconsistently with and/or violated applicable law enforcement standards, including but not limited to City of Jacksonville, Florida standards, as they relate to interacting with individuals with mental health issues;

I. Acted inconsistently with and/or violated their own training and their own standard operating procedures; and

J. Were otherwise engaged in wrongful conduct by acting with intentional disregard for the health and safety of Brian.

44. As a proximate result of one or more of the aforementioned intentional acts or omissions, Brian suffered injuries that resulted in his death.

45. At all relevant times, Officer Bumgarner was acting under color of law and within the scope of his employment by, and as an agent of the City of Jacksonville, Florida. As such, the City of Jacksonville, Florida is liable for the misconduct of its officers, including Officer Bumgarner, under the legal theory of *respondeat superior*.

46. Plaintiff is the duly appointed representative of the Estate of Brian Gillis and was his mother at the time of his death.

47. A notice of claim relating to this incident was properly served upon all required entities and individuals on December 15, 2025.

**Request for Relief**

WHEREFORE, Plaintiff Melody Gissentanner, as personal representative of the Estate of Brian Gillis, prays for judgment against Defendant City of Jacksonville, Florida and requests an award of compensatory damages, costs, and any other relief that is just and appropriate.

**Jury Demand**

Plaintiff Melody Gissentanner, as personal representative of the Estate of Brian Gillis, demands a trial by jury.

DATED this 16th day of November 2026.

*/s/ Mary Sherris*
Mary Sherris
Florida Bar Number: 0138134
Sherris Legal, P.A.
121 South Orange Avenue, Suite 1500
Orlando, FL 32801
(407) 999-9955 Phone
Primary email: service@sherrislegal.com
Secondary email: msherris@sherrislegal.com
Attorney for Plaintiff

Hale Law, LLC

Andrew M. Hale: andy@ahalelaw.com
Jason M. Marx: jmarx@ahalelaw.com
53 West Jackson, Suite 334
Chicago, IL 60604
(312) 870-6912
Attorneys for Plaintiff
*Pro Hac Vice* applications forthcoming